IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

```
- - - - - - - - - - - - - X
UNITED STATES OF AMERICA,  :
                           :
      Plaintiff,           :
                           :
vs.                        :      Case No. 3:20-cr-42
                           :
TERRY LEE DOUGLAS, III,    :   SENTENCING HEARING TRANSCRIPT
                           :
      Defendant.           :
- - - - - - - - - - - - - X
```

Courtroom 242, Second Floor
U.S. Courthouse
131 East Fourth Street
Davenport, Iowa
Thursday, April 22, 2021
8:34 a.m.


BEFORE:  THE HONORABLE JOHN A. JARVEY, Chief Judge


APPEARANCES:

For the Plaintiff:        CLIFFORD R. CRONK, III, ESQ.
                          United States Attorney's Office
                          U.S. Courthouse
                          131 East Fourth Street, Suite 310
                          Davenport, Iowa  52801


For the Defendant:        ALFRED E. WILLETT, ESQ.
                          Viner Law Firm
                          228 Second Street SE
                          Cedar Rapids, Iowa  52401


TONYA R. GERKE, CSR, RDR, CRR
United States Courthouse
123 East Walnut Street, Room 197
Des Moines, Iowa 50309

1          P R O C E E D I N G S

2          THE COURT:  We're here in the matter of the United

3  States versus Terry Douglas.  This is Case 3:20-cr-42.  He's

4  before the Court for sentencing.  Mr. Douglas pled guilty on

5  December 3rd of last year to Count 1 of the May 12, 2020,

6  indictment.  He's present.  He's represented by Al Willett.  The

7  Government's represented by Cliff Cronk.

8          In preparation for sentencing, I've reviewed the

9  presentence report in its entirety as well as the sentencing

10  memoranda that were filed.  In preparation for sentencing, it's

11  my observation that we have issues relating to the defendant's

12  role in the offense, the drug quantity, and we don't have any

13  longer objections to paragraphs 49 and 51, the criminal history

14  category points.

15          Mr. Cronk?

16          MR. CRONK:  First of all, Your Honor, we've reached an

17  agreement that might shorten the hearing, and that agreement is

18  that both parties are agreeing to drug quantity, so objections

19  relative to drug quantity don't apply today because both parties

20  agree that the drug quantity is between 1.5 and 4.5 kilograms of

21  ice or actual methamphetamine, which would establish a base

22  offense level of 36.  I don't know if the Court wants to inquire

23  of Mr. Willett about that before I move on.

24          THE COURT:  Fine.  Mr. Willett?

25          MR. WILLETT:  That is true, Your Honor.  I visited on

1  that issue with my client this morning as well as role in the

2  offense, and I'm sure Mr. Cronk will want to continue about his

3  discussion with role in the offense, but we will agree that for

4  purposes of the Court's initial calculations, the base offense

5  level is 36 as it pertains to drug quantity.

6            THE COURT:  Mr. Douglas, do you understand this?

7            THE DEFENDANT:  Yes, sir.

8            THE COURT:  You agree to it?

9            THE DEFENDANT:  Yes.

10           THE COURT:  Good.  All right.  It makes sense too.

11  This is -- this is a reasonable resolution of that issue from

12  what I can see in the presentence report.

13           Mr. Cronk?

14           MR. CRONK:  Your Honor, we are asking for a

15  three-level upward adjustment for aggravating role in the

16  offense.  It might have been two had there been fewer

17  participants, but we're not asserting that he is the organizer

18  or leader, at least not with the facts in this case.

19           Did the Court get my sentencing exhibits which I

20  intend to authenticate today through Jesse Bell?

21           THE COURT:  No.

22           MR. CRONK:  I filed those yesterday.  I have hard

23  copies of them here.

24           THE COURT:  Can you bring -- do you have one for me?

25           MR. CRONK:  Well --

1          PROBATION OFFICER WULFF:  Is it these?

2          THE COURT:  She's got it.  I've got it.  Oh, I had

3   seen this.  Yes.  I'm sorry.  Yeah, I saw these.

4          MR. CRONK:  Thank you.  So the person referenced, for

5   instance, in Exhibit 1 is a woman named Shea Cohagan, and

6   she's --

7          THE COURT:  She's in the presentence report.  I saw

8   it.

9          MR. CRONK:  Yes.  And she's referred to -- she's the

10  individual the Government is strongly advocating is the person

11  who essentially was managed by the defendant, and she's in the

12  courtroom today, and I asked her if she had come anticipating to

13  be a witness, and she said no.  So I -- I don't -- and I advised

14  her that that was the nature of today's hearing and that there

15  would be evidence presented about her role and his role with

16  her.  I'm only slightly concerned that if we pursue testimony --

17  I wasn't going to call her as a witness, but I wasn't sure if

18  Mr. Douglas would want to call her, and if that was going to

19  happen, then I would want witnesses sequestered.  That's all I

20  wanted to raise before I proceed.

21          THE COURT:  Mr. Willett?

22          MR. WILLETT:  It was not my intent to call a defense

23  witness, Your Honor, and I've -- I've only had Ms. Cohagan

24  pointed out to me in the last five minutes.  I've never spoken

25  with her, so it's not my intent to call somebody to the stand

1 who I've never met or talked to.

2 MR. CRONK: Let's leave it that way then, and Your

3 Honor can take into consideration if they do decide to call her

4 or if she ends up testifying that whatever effect having sat

5 here through the hearing would have on her.

6 THE COURT: Okay.

7 MR. CRONK: And we're prepared to call Deputy Jesse

8 Bell.

9 THE COURT: Come forward, sir.

10 MR. WILLETT: Your Honor, if I may point out one case

11 on role in the offense before Mr. Bell starts testifying?

12 THE COURT: Sure.

13 MR. WILLETT: I found a very recent Eighth Circuit

14 case last night when I was preparing for this sentencing hearing

15 in regards to role in the offense. I think it's more recent

16 than any citation Mr. Cronk may have given the Court. *United*

17 *States versus Ford*, F-o-r-d, 987 F.3d 1210. The parallel cite

18 is at page 1214, a 2021 decision out of an appeal from the

19 Western District of Arkansas, and Judge Erickson opined for the

20 Court. The very pertinent sentence at page 1214 is, In order

21 for the enhancement to be properly applied, the district court

22 must make a finding that the defendant organized or led another

23 participant, and then there's a cite to a case, *United States*

24 *versus Musa*, M-u-s-a, 830 F.3d at 788. I just want the Court to

25 be aware of that.

1    THE COURT:  Thank you.  Come forward, sir.  You know

2  the drill.

3         JESSE BELL, GOVERNMENT WITNESS, SWORN

4         THE CLERK:  Please be seated.

5         THE COURT:  Go ahead.

6         MR. CRONK:  Thank you.

7                 DIRECT EXAMINATION

8  BY MR. CRONK:

9  Q.  Would you start by telling us your name and then spell your

10  last name, please.

11  A.  Jesse Bell, B-e-l-l.

12         THE COURT:  You can remove your mask for testimony.

13  Q.  Thank you.  Would you tell us your occupation.

14  A.  Deputy sheriff with the Henry County Sheriff's Office.

15  Q.  And do you have any special assignments within the sheriff's

16  office?

17  A.  I'm the investigator and assigned to the drug task force.

18  Q.  Can you tell us how long you've been a police officer?

19  A.  Since 2010.

20  Q.  And where are you from originally?

21  A.  The southeast Iowa area.

22  Q.  Can you tell us, do you know a person by the name of Terry

23  Lee Douglas, III?

24  A.  Yes.

25  Q.  And do you see him here today?

1   A.   Yes.  He's sitting at the defendant's table.

2   Q.   Thank you.  Are you familiar, because you -- with

3   Mr. Douglas at least because you were the lead investigator in

4   the case that came to federal court that brought us here?

5   A.   Yes.

6   Q.   And during the course of your investigation of Mr. Douglas,

7   have you interviewed individuals, talked to subjects who have

8   described his drug dealing operation?

9   A.   Yes.

10  Q.   During the course of that investigation and during those

11  interviews, have you learned that Mr. Douglas has people do

12  things for him?

13  A.   Yes.

14  Q.   And can you be more specific what sorts of things?

15  A.   During the investigation, I've learned where if people -- he

16  either asked -- people asked him -- asked people to ask him for

17  drugs, or he asked people to ask other people to get drugs.

18  Q.   Does he -- as far as you know, does he have anyone drive him

19  around, for instance?

20  A.   He has -- I've heard he's had multiple people with him in

21  the vehicle.

22  Q.   All right.  Can you tell us, are you familiar with a Shea

23  Cohagan?

24  A.   Yes.

25  Q.   During the course of this investigation, did you find

1  Facebook messages through search warrants that included her

2  Facebook account?

3  A.  Yes.

4  Q.  And did it also include Mr. Douglas's Facebook account?

5  A.  Yes.

6  Q.  Did you find Facebook messaging that indicated a

7  connection -- a drug connection between Ms. Cohagan and the

8  defendant?

9  A.  Yes.

10  Q.  I'm going to show you what's marked as Government's Exhibit

11  Number 1.  Do you recognize what that is?

12  A.  Yes.

13  Q.  And what is that?

14  A.  It's a Facebook record from, I believe, Shea's Facebook

15  records.

16  Q.  Tell us, when you got Facebook records from Facebook after a

17  search warrant, roughly how many pages of messaging did you get?

18  A.  They varied from several hundred to thousands of pages.

19  Q.  And did you go through all of those?

20  A.  Most of them.

21  Q.  Okay.  On this particular record, Exhibit 1, what page of

22  the records is it?

23  A.  Page 609.

24  Q.  And can you tell us what time period you sought from

25  Facebook?  What -- I mean, roughly when that search warrant was

1   served?

2   A.   I -- during this investigation, I did multiple Facebook

3   warrants, and they were generally in the January, February,

4   March of 2020.

5   Q.   Was that after the January arrest of Mr. Douglas with the

6   duffel bag with the quarter kilogram of meth in it?

7   A.   Yes.

8   Q.   And was it shortly after an arrest on March 30th, March

9   29th, thereabouts where more drug-type items were recovered from

10  the defendant?

11  A.   Yes.

12  Q.   Were you involved in the May 2020 activities involving the

13  defendant going to Galesburg with Crystal Ecker?

14  A.   Yes.

15  Q.   And when he returned from Galesburg after having met his

16  supplier -- or a supplier, did you or other agents recover

17  roughly two ounces of meth from him on May 1st thereabouts?

18  A.   Yes.

19  Q.   Can you tell us leading up to that, had you already

20  approached Crystal Ecker and asked her to cooperate with your

21  investigation?

22  A.   Yes.

23  Q.   About when was that?

24  A.   It would have been the end of April 2020.

25  Q.   And on that occasion, did she talk to you about Mr. Douglas

1  and her vehicle?

2  A.  Yes.

3  Q.  What did she tell you?

4  A.  She said that the defendant was going to utilize her vehicle

5  to go to Illinois to try to get meth.

6  Q.  And was it your understanding then that she was willing to

7  cooperate in your investigation at that point?

8  A.  Yes.

9  Q.  And what did you do with respect to her vehicle?

10  A.  A GPS search warrant was obtained, and a tracker was placed

11  on her vehicle.

12  Q.  Did you advise her of that?

13  A.  No.

14  Q.  And do you know where her vehicle went then the day after

15  she -- or the day that she told you what he was going to do with

16  her car?

17  A.  To Galesburg.

18  Q.  It was tracked to Galesburg?

19  A.  The records, yes.

20  Q.  And what happened when her vehicle came back?  Did you talk

21  to her after that?

22  A.  I would have talked to her after that, yes, because after

23  that is when we -- when he went the second time.

24  Q.  When he got back and wanted to go a second time, what was

25  the reason to go a second time?

1  A.  To get more meth.

2  Q.  What happened to the meth he got the first time?

3  A.  It was gone.

4  Q.  In what way?

5  A.  He had got rid of it all.

6  Q.  Do you know roughly how much he was getting each time?

7  A.  I believe it was supposed to be an ounce or two.

8  Q.  So the second time that he went to Galesburg at least at the

9  end of April or early May, both times that you're aware of, he

10  used Crystal Ecker's car?

11  A.  I believe twice, yes.

12  Q.  Can you tell us who drove the car the second time?

13  A.  I believe it was Shea that drove the second time.

14  Q.  Was she in the car when it was stopped after they came back?

15  A.  Yes.

16  Q.  So Shea was driving Crystal's car, and Terry Douglas was in

17  the car?

18  A.  I believe so, yes.

19  Q.  Let's go to Exhibit 1.  Why did you pull that exhibit?

20  A.  This exhibit is, again, from Shea's Facebook, and there's a

21  subject named Renee Murphy that asked Shea -- I'll just read the

22  quote.  It says, Have you seen Terry?  Someone has been trying

23  to get ahold of him.  And then a few messages later -- or Renee

24  then says, Hello; hey, are y'all good?  Shea says, Hey, we can

25  be.  Renee says, Well, I need him to call Amanda; there is money

1  here.  And then Shea says, He's asleep, and then a few messages

2  later Shea says, What do you need; I may be able to make moves;

3  I do have all his hook-ups.  Shea says, And everyone is aware I

4  might be for him.  Then the next message is, Move for him.

5  Renee responds, I need a half O but only have 180; how much is

6  it?

7  Q.  So what does that mean to you, all of that dialogue?

8  A.  That Renee is contacting Shea to try to get drugs from

9  Terry.

10  Q.  And what is that last reference to an O?

11  A.  It would be a half ounce.

12  Q.  And does Shea indicate -- what does she mean when she says

13  she has his connects?

14  A.  I would take it as she has his hook-ups as she knows his

15  sources also.

16  Q.  And she says she can move for him?

17  A.  Move for him would be indicative in the drug language of

18  making moves or doing drug transactions.

19          MR. CRONK:  Your Honor, if I haven't done so, I move

20  to admit Number 1.

21          MR. WILLETT:  No objection.

22          THE COURT:  Received.

23          * * * Government Exhibit 1 was received. * * *

24  Q.  I'll show you Number 2 and see if you recognize what that

25  is.

1  A.  Yes.

2  Q.  What is Number 2?

3  A.  It is another Facebook record, and I believe this one is

4  from records received from the defendant's Facebook.

5  Q.  Tell us --

6         MR. CRONK:  Well, I move to admit Exhibit 2.

7         MR. WILLETT:  No objection.

8         THE COURT:  Received.

9         * * * Government Exhibit 2 was received. * * *

10  Q.  What are the referenced dates for the item entries from the

11  record that is now Government Exhibit 2?

12  A.  The dates on this Facebook record begin on March 22nd, 2020,

13  and they go through March 23rd of 2020.

14  Q.  And tell us, what does that record indicate to you?  What's

15  it about?

16  A.  The record is a conversation between the defendant and Shea

17  Cohagan, and it -- Terry Douglas tells her, quote, Putting a

18  play together; got a job for you, though, and then a few

19  messages later, Shea asks what is up, that -- it says, quote, I

20  got you.  Shea then tells -- sends a message that says, I've got

21  Esau wanting a QP from McDonald's, and then there's another

22  message where -- a few messages later Shea says, I'm ready

23  whenever.

24  Q.  Okay.  Let's talk about Esau.  Who is Esau?

25  A.  It would be Esau Rios.

1   Q.  And who is he?

2   A.  He is a known methamphetamine trafficker in the southeast

3   Iowa area.

4   Q.  And are you aware that in January of this year he was

5   arrested with a substantial quantity of methamphetamine in

6   Bettendorf, Iowa?

7   A.  Yes.

8   Q.  Were there other Facebook messages that you found in

9   connection with this particular series of messages, either

10  between Esau Rios and Shea Cohagan or the defendant and Shea

11  Cohagan?

12  A.  Yes.

13  Q.  What's QP mean to you?

14  A.  It would be indicative of quarter pound, so a quarter pound

15  of methamphetamine.

16  Q.  And why say a QP from McDonald's?

17  A.  That would be trying to disguise their language of what

18  they're talking about.

19  Q.  You don't think she meant that Esau wanted Terry to go to

20  McDonald's and get him a Quarter Pounder?

21  A.  No, I do not.

22  Q.  Let me show you Number 3.  Can you tell us what that is?

23  A.  This is a Facebook record from Shea's Facebook records, and

24  it's a conversation between Shea and Esau Rios in March -- on

25  March 22nd and 23rd of 2020.

1    MR. CRONK:  Move to admit Number 3.

2    MR. WILLETT:  No objection.

3    THE COURT:  Received.

4    * * * Government Exhibit 3 was received. * * *

5  Q.  Let me hand you Number 4.  Can you tell us what that is?

6  A.  It's a Facebook record, I believe, from the defendant's

7  Facebook records, and it's between the defendant and Shea, and

8  it's on March 25th and March 26th of 2020.

9    MR. CRONK:  Move to admit Number 4.

10    MR. WILLETT:  No objection.

11    THE COURT:  Received.

12    * * * Government Exhibit 4 was received. * * *

13  Q.  Looking at 2, 3, and 4, what is all that about?

14  A.  So in Exhibit Number 2, Shea tells the defendant, I got Esau

15  wanting a QP from McDonald's and -- and that is on March 22nd,

16  2020, at 22:35 UTC time.

17    In Exhibit Number 3, prior to that on -- between Shea

18  and Esau, Esau -- on March 22nd at 21:37 Shea says, What you

19  need?  Esau responds, I've been shopping around all day, and

20  I've been -- and all I've been getting is outrageous prices; and

21  if it's gonna be a take-the-money-and-wait deal, I can't do it

22  that way; sorry; but I seriously need a QP; I need it yesterday.

23  And Shea responds, Okay; I'll see what I can do.

24  Q.  And then what's the next one?  Number 4?

25  A.  Well, and then later on -- well, Number 4 is another message

1  between Shea and Terry where Terry tells Shea, Hit up Esau for a

2  zone; zone and a half, and that's on March 26th at approximately

3  04:00 UTC time, and then Exhibit Number 2 -- or excuse me --

4  Exhibit Number 3 --

5  Q.  So does Exhibit Number 2 go back to Shea?  She says she'll

6  see what she can do.  Then she gets ahold of Mr. Douglas and

7  tells him that Esau wants a QP?

8  A.  Yes.

9  Q.  And then she gets back to Esau?

10  A.  This one does not go back to Esau.  It just says, Esau asks

11  any word.

12  Q.  So she's checking to see if she can get it for him?

13  A.  Yes.

14  Q.  And then Exhibit 4 is later?

15  A.  Yes, on the 26th.

16  Q.  And that's when Terry is asking Ms. Cohagan to get meth from

17  Esau?

18  A.  Yes.

19  Q.  Is that common?

20  A.  Yes.

21  Q.  In what way?

22  A.  It would be if -- if the defendant's current supplier was

23  dry or out, then they would check with somebody else that may

24  have a supply to get from.

25  Q.  Let me show you Number 5.  Do you recognize what that is?

1   A.   Yes.  It's a Facebook record from Shea's Facebook records.

2   Q.   And does it correlate with Number 4?

3   A.   Yes.  So in Number 4, the defendant tells Shea hit -- hit up

4   Esau for a zone or zone and a half, and then Shea's Facebook

5   between Shea and Esau -- Shea asked Esau, Can you get anything;

6   need 1 and a 1/2.

7               MR. CRONK:  Move to admit 5.

8               MR. WILLETT:  No objection.

9               THE COURT:  Received.

10              * * * Government Exhibit 5 was received. * * *

11  Q.   Let me show you Number 6.  Do you recognize what that is?

12  A.   Yes.  That's another Facebook record from Shea -- Shea or

13  Terry's Facebook between -- a conversation between the two.

14  Q.   And who does it relate to?

15  A.   It relates to both Shea and the defendant.

16  Q.   Anyone else?

17  A.   And the subject named Ben.

18  Q.   And are you familiar with a subject named Ben who may have

19  appeared in the records or in your investigation?

20  A.   Yes.

21  Q.   Who is that?

22  A.   It is a Ben --

23  Q.   Are you drawing a blank?

24  A.   I'm drawing a blank on his last name.

25  Q.   Is it Mitchell?

1  A.  Ben Mitchell, yes.

2  Q.  Can you tell us, what is Number 6?

3  A.  There's a conversation on March 27th where Shea tells the

4  defendant, quote, Listen, Ben has 300; I asked him to FB pay me

5  so I could get it to you, but he refuses but will drive to you.

6  Q.  And what does an FB pay mean?

7  A.  It appears to be a Facebook pay.

8          MR. CRONK:  Move to admit Number 6.

9          MR. WILLETT:  No objection.

10         THE COURT:  Received.

11         * * * Government Exhibit 6 was received. * * *

12  Q.  In your search of Facebook records, did you find reference

13  to a person named Shane Hauser?

14  A.  Yes.

15  Q.  And do you know who that is?

16  A.  A subject from the Iowa City area, I believe.

17  Q.  And is he involved in methamphetamine as far as you know?

18  A.  Yes.

19  Q.  Was there obvious drug conversations between Mr. Hauser and

20  the defendant in Facebook?

21  A.  Yes.

22  Q.  And can you tell us, were those messages making arrangements

23  for Mr. Hauser to either meet the defendant in Riverside or at

24  his residence in Burlington?

25  A.  Yes, both places were mentioned in the records.

1  Q.  Do you remember how many interactions there would have been?

2  A.  I do not.  There's several pages of messages.

3  Q.  Did you later learn that the Iowa City Police Department

4  had -- or the Johnson County Drug Task Force had an

5  investigation into Mr. Hauser?

6  A.  Yes.

7  Q.  And was it related to methamphetamine?

8  A.  Yes.

9           MR. CRONK:  That's all I have.

10          THE COURT:  Mr. Willett?

11          MR. WILLETT:  Thank you, Judge.  May I use the Court's

12  lectern?  Thank you.

13                    CROSS-EXAMINATION

14  BY MR. WILLETT:

15  Q.  Deputy Bell, good morning.

16  A.  Hello.

17  Q.  I didn't hear what county you're from.

18  A.  Henry County.

19  Q.  Sure.  Mount Pleasant?

20  A.  Yes.

21  Q.  Sure.  You started at the beginning of your testimony with

22  Assistant U.S. Attorney Cronk by talking about Ms. Cohagan and

23  what role she might have in terms of driving my client around.

24  Do you remember that testimony?

25  A.  Yes.

1  Q.  Okay.  Based upon your investigation into this case and

2  based upon the reports you've read, the interviews you've

3  conducted, are you aware of how this relationship started

4  between my client and Ms. Cohagan?

5  A.  No.

6  Q.  Okay.  Do you still have the Government exhibits in front of

7  you that Mr. Cronk was passing to you?

8  A.  Yes.

9  Q.  Let's -- let's turn our attention to Government Exhibit 1,

10  if we may.

11  A.  Okay.

12  Q.  And I'm looking at towards the bottom third of the page.  It

13  appears that Ms. Cohagan is having a conversation with a

14  Ms. Murphy; would that be correct?

15  A.  Yes.

16  Q.  And it appears from Government Exhibit 1 that Ms. Murphy is

17  trying to reach out to my client; correct?

18  A.  Yes.

19  Q.  But it appears from Government Exhibit 1 that he's asleep.

20  A.  Correct.

21  Q.  And Ms. Murphy doesn't want to wait for Mr. Douglas;

22  correct?  Let me ask a better question.  She's afraid

23  Mr. Douglas is going to be asleep for quite some time, and she

24  doesn't want to wait for him to wake up; would that be fair?

25  A.  She states that he'll probably sleep the rest of the night.

1  Q.  Okay.  And then right after that at 1:13 in the morning,

2  there's a response from Ms. Cohagan, What do you need; I may be

3  able to make moves; I do have all his hook-ups; correct?

4  A.  Correct.

5  Q.  Okay.  And then right after that, there's a follow-up

6  message from Ms. Cohagan, And everyone is aware I might be for

7  him; correct?

8  A.  Correct.

9  Q.  Now, in terms of any type of relationship -- criminal

10 relationship between Mr. Douglas and Ms. Cohagan, I know you

11 told me you don't know how the relationship started; correct?

12 A.  Correct.

13 Q.  Are you aware of what the agreement was, if you will,

14 between Mr. Douglas and Ms. Cohagan regarding distributions of

15 meth?

16 A.  I am not, no.

17 Q.  Okay.  Now, there were times during your testimony with

18 Mr. Cronk where it was my perception you were qualifying your

19 answer by saying I believe so.  Do you remember saying that on

20 occasion during your direct testimony?

21 A.  Yes.

22 Q.  Now, when you say I believe so, I take it you're not sitting

23 here testifying I'm certain that this is the way it went down.

24 A.  To the best of my knowledge, that's what I remember.

25 Q.  Fair enough.  Now, in terms of your discussion with

1  Mr. Cronk as to who the driver was on occasion for Mr. Douglas,

2  you discussed a Ms. Ecker during your direct; correct?

3  A.  As her vehicle being used?

4  Q.  Okay.  Was it your understanding that she was ever a driver

5  for Mr. Douglas?

6  A.  Not that I recall.

7  Q.  And back to Ms. Cohagan, Mr. Cronk discussed with you a -- a

8  second occasion when Ms. -- let me make sure I get the name

9  right -- when Ms. Ecker's vehicle was used.  Was it your

10 understanding that Ms. Cohagan was driving on either of those

11 two occasions regarding Ms. Ecker's vehicle?

12 A.  To my recollection, I thought Cohagan was driving when the

13 traffic stop occurred when the defendant was found in possession

14 of the two ounces.

15 Q.  Okay.  And just so I'm clear, were you one of the law

16 enforcement agents that was present during that traffic stop?

17 A.  I was not on the scene of that traffic stop, but I was there

18 during that time.

19 Q.  But you were -- I didn't hear the last phrase.

20 A.  I was there during the investigation.  I was not on scene

21 for the traffic stop.

22 Q.  Okay.  And did somebody advise you that Ms. Cohagan was

23 indeed the driver?

24 A.  I believe so, yes.  That's why I recall that.

25 Q.  Now, you also testified during direct that Ms. Cohagan was

1  aware of Mr. Douglas's sources also, or were you referring to

2  Ms. Ecker at that point?  I've got in my notes she knows his

3  sources also?

4  A.  That was from the Facebook records, I believe.

5  Q.  And who were you referring to in terms of knowing his

6  sources also?

7  A.  Well, on Exhibit 1 where she says I know his -- I do -- Shea

8  tells Ms. Murphy, What do you need; I may be able to make moves;

9  I do have all his hook-ups, that would be referring to the

10  defendant's sources.

11  Q.  Okay.  But that was Ms. Cohagan articulating that?

12  A.  Yes.

13  Q.  Okay.  Government Exhibit 3?  And this is a Facebook page,

14  just so I have -- this is Ms. Cohagan's Facebook page is

15  Government Exhibit 3?

16  A.  Yes.

17  Q.  And this is Mr. Rios reaching out to Ms. Cohagan?

18  A.  Yes.

19  Q.  And then Government Exhibit 4 is the defendant's Facebook

20  page.  Is that your testimony?

21  A.  I believe so, yes.

22  Q.  And then Government Exhibit 5 is whose Facebook page?

23  A.  That is from Shea's Facebook records.

24  Q.  Okay.  And in Government Exhibit 5, at the top we see

25  Ms. Cohagan stating at 4:10 in the morning, Hey, can you help me

1  with something?

2  A.  Can you get anything?  Oh, yes.  Yes.  You're right.

3  Q.  And you were one question ahead of me.  And right underneath

4  that, Can you get anything?

5  A.  Yes.

6  Q.  And your understanding is she's again speaking to Mr. Rios.

7  A.  Yes.

8  Q.  And then Government Exhibit 6 is whose Facebook page again?

9  Ms. Cohagan's?

10  A.  I believe it's from the defendant's Facebook records, but

11  it's a conversation between Shea and the defendant.

12  Q.  Okay.  And -- and again you say I believe.  You keep using

13  that qualifier.  Are you sure?

14  A.  To the best of my recollection, we got this -- or this came

15  from the defendant's, yes.

16  Q.  Now, you discussed with Mr. Cronk a gentleman by the name of

17  Mr. Hauser; correct?

18  A.  Yes.

19  Q.  And from your testimony, it appears that you did not know

20  the number of transactions, but there were drug transactions

21  between he and Mr. Douglas is your testimony.

22  A.  Yes.

23  Q.  And Mr. Hauser was never a driver for Mr. Douglas; am I

24  correct?

25  A.  In my investigation, no.

1  Q.  In terms of these Government exhibits that we've had a

2  chance to go through, occasionally we see a reference to either

3  quantity or amounts of money; correct?

4  A.  Yes.

5  Q.  We don't see any discussion in these Government exhibits

6  between Mr. Douglas and Ms. Cohagan regarding I want this much

7  money; I'll give you that much, anything of that nature, do we?

8  A.  The only thing referring to the money here was where Shea

9  tells the defendant that she's trying to get the 300 for him.

10  Q.  I understand.  But there's no discussion of Mr. Douglas

11  saying, Well, I'm going to take 200 and you get 100 or anything

12  of that nature, is there?

13  A.  In these exhibits, no.

14  Q.  And it appears at least from a literal reading of Government

15  Exhibit 1, Ms. Cohagan makes reference to, What do you need; I

16  may be able to make moves; I do have all his hook-ups.

17  A.  Correct.

18  Q.  Almost the kind of language you would expect from an alleged

19  co-conspirator; correct?

20  A.  On that sentence, yes, but then where she says she makes

21  moves for him, it would be that she's working for him.

22  Q.  And then the reference just above that line, And everyone is

23  aware I might be for him.

24  A.  Which I believe -- yes, that she says -- And everyone is

25  aware I might be for him, and then she says, Move for him, so it

1  appears that she meant move for him, not be for him.

2         MR. WILLETT:  Okay.  Your Honor, thank you.

3         THE COURT:  Mr. Cronk?

4         MR. CRONK:  Thank you.

5                REDIRECT EXAMINATION

6  BY MR. CRONK:

7  Q.  I forgot to mention this incident from -- or from your first

8  direct, but it has to do with driving.  Does -- has Mr. Douglas,

9  the defendant, gotten in trouble for driving?

10 A.  Yes.

11 Q.  And do you know what car he normally drove?

12 A.  He was arrested in his black car for driving it in Wapello,

13 Iowa.

14 Q.  And is that a black Mercedes?

15 A.  Yes.

16 Q.  Have people described that as -- as his car?

17 A.  Yes.

18 Q.  Was there an incident where -- in Wapello, Iowa, which is

19 Louisa County, where was he arrested driving the black Mercedes?

20 A.  Yes.

21 Q.  And who was it listed to then?

22 A.  At that time the vehicle was registered to a Lisa Hank.

23 Q.  And do you know who that is?

24 A.  A subject from Burlington.

25 Q.  Is she involved in methamphetamine as far as you know?

1  A.  Not to my knowledge.

2  Q.  Can you tell us, did anything peculiar as far as you're

3  concerned occur after the stop in Wapello with the black

4  Mercedes?

5  A.  Yes.

6  Q.  What was that?

7  A.  The -- the traffic stop was on February 29th, 2020, and

8  that's when he was arrested -- or the defendant was arrested for

9  driving that vehicle, and it was registered to Lisa Hank at that

10 time.  So March 2nd, 2020, the vehicle was re-registered to Shea

11 Cohagan.

12 Q.  In order to get a vehicle registered to your name, does the

13 title have to transfer?

14 A.  Yes.

15 Q.  So presumably the title of the car that Mr. Douglas was

16 driving was transferred two days after he was stopped in it to

17 Shea Cohagan?

18 A.  Yes.

19 Q.  Could you explain why that would be to Mr. Douglas's

20 benefit?

21       MR. WILLETT:  Your Honor, excuse me.  To the extent

22 that that answer calls for speculation from the witness, I would

23 object.

24       THE COURT:  Overruled.  Answer the question.

25 A.  The reason the registration was -- would have been switched,

1　because that car that the defendant was utilizing -- the

2　registered owner had a suspended driver's license, which is why

3　he was stopped and arrested when the law enforcement ran the

4　plate.　It came back to a suspended driver giving cause to stop.

5　So to assist him in being able to drive that car without a

6　license himself and avoid detection from law enforcement, they

7　would -- they would have reregistered the car to a valid driver

8　to avoid detection when the plates were ran by law enforcement.

9　Q.　So sometimes he needs a driver because if law enforcement

10　sees him driving, he can get arrested.

11　A.　Correct.

12　Q.　And if he's got drugs, he doesn't want to get arrested;

13　right?

14　A.　Correct.

15　Q.　So on that early May trip to Galesburg, it was to his

16　benefit to have someone drive for him.

17　A.　Yes.

18　Q.　Someone that knows that he's involved in drug trafficking.

19　A.　Yes.

20　Q.　Tell us, in the Facebook messages, can you tell overall

21　who's in charge between Mr. Douglas and Ms. Cohagan?

22　A.　From these messages right here, the defendant.

23　Q.　Is that consistent with the -- all the other Facebook

24　messages that you've reviewed that show drug activity?

25　A.　Yes.

1  Q.  Tell us, do you know who this Renee Murphy is?

2  A.  I've heard of her from the Burlington area.

3  Q.  In what capacity?

4  A.  In narcotic investigations.

5  Q.  And this UTC time that you've talked about, is that not the

6  time of day here?

7  A.  Correct.

8  Q.  It is or it isn't?

9  A.  I'm sorry.  It is not the time of day.  It is -- UTC, you

10  would back up either five or six hours, depending on daylight

11  savings, and I'm not sure what it is in this instance, but it

12  would be five or six hours prior to what is listed.

13         MR. CRONK:  That's all I have.

14         THE COURT:  Mr. Willett?

15         MR. WILLETT:  Briefly, Your Honor.

16                    RECROSS-EXAMINATION

17  BY MR. WILLETT:

18  Q.  Deputy, do you have Government Exhibit 4 in front of you,

19  sir?

20  A.  Yes.

21  Q.  Mr. Cronk was discussing with you on redirect what reasons

22  there might be for one individual to change title to another

23  individual in terms of registration.  Do you remember that

24  conversation?

25  A.  Yes.

1  Q.  At the top of Government Exhibit 4, do you see the first

2  line from Mr. Douglas to Ms. Cohagan?

3  A.  You believe in everyone and everything but me?

4  Q.  Correct.  And then two lines down Mr. Douglas goes on to

5  say -- two conversations down.  I think that's a better way to

6  put it.

7  A.  I'm about to pull up.  Is that what you're referring to?

8  Q.  Just above it.

9  A.  And that breaks my heart.

10  Q.  Correct.  And then two -- just underneath the conversation

11  I'm about to pull up, Ms. Cohagan replies?

12  A.  You're wring.

13  Q.  Could be you're wrong?

14  A.  Could be you're wrong.

15  Q.  Underneath that Ms. Cohagan says?

16  A.  I believe in you; that's why I'm still here.

17  Q.  Mr. Douglas responds by saying?

18  A.  But you ain't here, though.

19  Q.  And Ms. Cohagan responds by saying?

20  A.  I just ain't sure my heart is safe with you.

21  Q.  And this is all during the course of March 25th?  Of 2020?

22  A.  Yes.

23  Q.  And this is after the title changed to the Mercedes Benz?

24  A.  Yes.

25  Q.  This would indicate that there was some sort of romantic

1  relationship between Mr. Douglas and Ms. Cohagan; correct?

2  A.  It's possible.

3  Q.  And one reason to transfer title to another individual is if

4  you're in a relationship with them and you want them to be able

5  to drive the car, you'd switch titles; correct?

6  A.  It's possible.

7        MR. WILLETT:  Thank you.  Thank you, Judge.

8        THE COURT:  Anything else, Mr. Cronk?

9        MR. CRONK:  Just one thing.

10              FURTHER REDIRECT EXAMINATION

11 BY MR. CRONK:

12 Q.  It wasn't in Mr. Douglas's name even when the title

13 transferred; right?

14 A.  Correct.  He was not valid.  He could not register it.

15        MR. CRONK:  That's all.

16        THE COURT:  Thank you.  You're excused.

17        Do you have any additional witness?

18        MR. CRONK:  Just one witness briefly.

19        THE COURT:  Okay.

20        MR. CRONK:  We call Ryan Wood.

21        THE COURT:  I find it interesting that you moved to

22 sequester witnesses and then didn't do it.

23        MR. CRONK:  Well, I wanted to make sure that we

24 weren't doing it.

25        THE COURT:  Oh, okay.  Go ahead.

1    RYAN WOOD, GOVERNMENT WITNESS, SWORN

2        THE CLERK:  Please be seated.

3            DIRECT EXAMINATION

4  BY MR. CRONK:

5  Q.  Please start by telling us your name, and then spell your

6  last name, please.

7  A.  Ryan Wood, W-o-o-d.

8  Q.  Tell us your occupation, please.

9  A.  I'm a police officer for the city of Iowa City.

10  Q.  And tell us how long you've been a police officer.

11  A.  I've been employed with Iowa City since 2006.

12  Q.  Tell us, are you assigned to the Johnson County Drug Task

13  Force?

14  A.  Yes, I am.

15  Q.  And during the course of your work, have you come across the

16  name of Terry Douglas?

17  A.  Yes.

18  Q.  Are you familiar with an individual named Shane Hauser?

19  A.  Yes, I am.

20  Q.  And who is Shane Hauser to you?

21  A.  He's a resident of the Johnson County area involved in the

22  distribution of methamphetamine.

23  Q.  Since May of last year, have you developed a case with

24  Mr. Hauser?

25  A.  Yes.

1 Q. And has he been charged?

2 A. Yes, he has.

3 Q. In relation to what type of crime?

4 A. Delivery of methamphetamine.

5 Q. Did you have an occasion to interview Mr. Hauser in June of

6 2020?

7 A. Yes.

8 Q. And did he provide information about dealing directly with

9 Mr. Douglas?

10 A. Yes.

11 Q. Did he provide information about other things too?

12 A. Yes, he did.

13 Q. Based on your interview with him and the other evidence that

14 you know of or have developed, was the information he provided

15 to you at that time accurate?

16 A. Yes.

17 Q. Did he indicate anything to you about meeting with the

18 defendant either at the Riverside Casino or at his residence in

19 Burlington to get drugs?

20 A. Yes. He stated he met with him at both locations, at

21 Riverside and Burlington.

22 Q. Did he indicate what type of car he used?

23 A. A black Mercedes.

24 Q. Did he indicate if anyone was involved with Mr. Douglas when

25 he served his customers?

1  A.  Yes.  He said there was white females that would drive him.

2  One particular female was named Shea he believed.

3  Q.  He was subpoenaed to be here today?

4  A.  Yes.

5  Q.  And he's here?

6  A.  Yes, he is.

7  Q.  And you went over this information with him before

8  testifying today?

9  A.  Yes.

10  Q.  And what did he claim about that?

11  A.  He stated he didn't remember.

12          MR. CRONK:  That's all I have.

13          THE COURT:  Mr. Willett?

14          MR. WILLETT:  Briefly, Your Honor.

15                    CROSS-EXAMINATION

16  BY MR. WILLETT:

17  Q.  I'm sorry.  I don't believe we've met.  I'm from Cedar

18  Rapids, but is it Detective?

19  A.  Yes.

20  Q.  The earlier assertion that you discussed with Mr. Cronk

21  regarding what Mr. Hauser was originally interviewed about in

22  terms of drivers and one of them might be Shea, did you ever

23  have a chance to corroborate Mr. Hauser's assertion about that

24  claim, that he believed that Shea was one of the drivers?

25  A.  I did not.

1         MR. WILLETT:  Thank you.

2         THE COURT:  Thank you, sir.  You're excused.

3         THE WITNESS:  Thank you.

4         THE COURT:  Anything else, Mr. Cronk?

5         MR. CRONK:  No, Your Honor.

6         THE COURT:  Do you have evidence, Mr. Willett?

7         MR. WILLETT:  No, thank you, Your Honor.

8         THE COURT:  Do you have argument you'd like to make,

9  Mr. Cronk?

10        MR. CRONK:  Only briefly, Your Honor.  We believe that

11 in spite of Mr. Willett's case on *Ford* that the evidence is

12 pretty clear that if you manage or have someone working for you

13 either to drive you to drug deals, to collect money, to notify

14 somebody to bring drugs, anything of that nature -- when you

15 employ someone else in your drug-dealing operation, you are a

16 manager, and that term is used broadly, and the evidence here by

17 a preponderance of the evidence clearly establishes that

18 Ms. Cohagan was, in fact, someone working for -- not just for

19 but with Mr. -- Mr. Douglas.

20        Your Honor is also very well aware that we're talking

21 about a flow of drugs from suppliers that apparently Ms. Cohagan

22 might have been familiar with, but we know specifically who some

23 of those suppliers are, and one of them is Jeffrey Goins and the

24 other Geneva Hudson, who were able to provide pounds of

25 methamphetamine not to Ms. Cohagan -- and there's no evidence it

1  went to Ms. Cohagan; it went to Mr. Douglas, and so the flow of

2  drugs is from the big suppliers to get pounds to Mr. Douglas,

3  and then that gets spread by Mr. Douglas with the help of

4  Ms. Cohagan to people buying quarter ounces and half ounces,

5  and -- after Mr. Goins gets arrested in February, Mr. Douglas

6  doesn't stop.  Now he's going to Esau Rios at times.  He's going

7  to Galesburg.  He's going to different places, and there's

8  Ms. Cohagan right in the middle of it again.  We believe we've

9  established well beyond a preponderance of the evidence that a

10  role adjustment is appropriate, and we're asking for three

11  levels.  There's more than five participants here.

12          THE COURT:  Mr. Willett, did the *Ford* case involve the

13  three-level increase?  Because the guideline itself specifically

14  says that you don't have to be an organizer or a leader; you

15  have to be a manager or supervisor of five persons -- sorry --

16  and the criminal activity involved five or more participants or

17  otherwise was extensive.  That seems inconsistent with the plain

18  language of it, and I'd like to read it before I resolve this.

19          MR. WILLETT:  Your Honor, at the -- just prior to the

20  quote that I gave you earlier, it appears that the *Ford* decision

21  involved a four-level enhancement for leadership role.

22          THE COURT:  Sure.  And that requires that the person

23  be an organizer or a leader, and the Court must find such, yes.

24          MR. WILLETT:  But in speaking to -- if I may in

25  responding to Mr. Cronk's --

1          THE COURT: Yeah.

2          MR. WILLETT: -- position, Your Honor, the compliment

3    to the probation office is, as you know, I don't always agree

4    with probation, but in this case I do, and I would point the

5    Court out to document 77, page 43 where the probation office

6    responds in the final PSIR was that the defendant's role is more

7    akin to the general relationship present between all

8    street-level drug suppliers and dealers.

9          THE COURT: Yeah. Yeah. But -- but the presentence

10   report -- the offense conduct statement written, I assume by the

11   prosecutor, did not contain the information that was present

12   here at the hearing today, and I scoured the presentence report

13   for evidence of a supervisory role here yesterday and couldn't

14   find it. There were references to the fact that -- or there was

15   a reference to an instance in which a purchaser would not pay

16   Ms. Cohagan but insisted on paying Mr. Douglas, and I was

17   looking for that, and that's -- and that's the rub here is that

18   it's different than what we were dealing with yesterday.

19         MR. WILLETT: I understand, Your Honor. I think the

20   best guidance I can give the Court is United States sentencing

21   guideline section 3B1.1, of course, talks about aggravating

22   role, and it's the application note 4 that talks about the

23   factors that the Court has to analyze, and that's what I was

24   trying to achieve through some of my cross-examination. Factors

25   the Court should consider include the exercise of decision

1  making authority, the nature of participation, the commission of

2  the offense, the recruitment of accomplices, the claimed right

3  to a larger share of the fruits of the crime, the degree of

4  participation in planning and organizing the offense, the nature

5  and scope of the illegal activity, and the degree and control of

6  authority exercised over others.

7         Now, no one was able to tell me if Ms. Cohagan was

8  recruited.  No one was able to tell me if Mr. Douglas ever made

9  a claim for a larger share of any money that came in as a result

10 of Ms. Cohagan's dealings.  In terms of the degree of

11 participation in planning or organizing, it appears from some of

12 the earlier exhibits, Government Exhibit 1, that Ms. Cohagan

13 arguably put herself out there as being an equal, that she

14 knew -- she knew the sources, she knew the hook-ups, she knew

15 that people were acting, quote, unquote, for him.  The degree of

16 participation in planning or organizing the offense, it seems to

17 go back and forth.  It's almost equal, Your Honor.  Obviously

18 we've discussed the nature and scope of the illegal activity,

19 the degree of control and authority exercised over others.

20        My concern, Your Honor, is that Mr. Cronk is trying to

21 expand those factors, if you will, to impose a three-level

22 enhancement against Mr. Douglas.  I go back to what probation

23 said which, of course, was before we heard today's evidence, but

24 it doesn't seem to me that this is a situation where Mr. Douglas

25 recruited or, quote, unquote, led.  This appears to be a team of

1  equals, and in that situation, Your Honor, if it's a

2  co-conspirator relationship, Your Honor, or just people actively

3  working with each other in these -- in these buys, I just don't

4  feel that that is deserving of a three-level enhancement arguing

5  that Mr. Douglas is a manager or supervisor, and so we would

6  still object.

7         THE COURT:  Thank you.  So I have this clear.  First

8  of all, I am going to find that he was a manager or supervisor

9  of Ms. Cohagan.  The exhibits show that she was working for him.

10 Now, the question is is that worth six more years in prison, and

11 it is not.  And so we have to -- we have to balance what the

12 probation office said with this guideline, and that is that in

13 any conspiracy, it's more successful when two people get

14 together than one person does it by themselves, and with four or

15 five, it's even more successful, and that mutual assistance that

16 people give in a conspiracy doesn't equate to more time in

17 prison.

18        So I find that he has a total offense level of 36 and

19 a criminal history category IV, and now we can get to where we

20 need to be, which is a sentence which is sufficient, but not

21 greater than necessary, to address the essential sentencing

22 considerations.

23        I'll hear first -- well, first of all, Mr. Cronk, did

24 you find errors in the presentence report -- factual errors?

25        MR. CRONK:  Not -- no, Your Honor.

1          THE COURT:  And, Mr. Willett, you originally objected

2    and then withdrew your objections to drug quantity and the

3    criminal history points.  We've -- I've resolved the manager

4    role.  Beyond that, did you find factual errors?

5          MR. WILLETT:  No, Your Honor.

6          THE COURT:  I find that the presentence report is

7    factually accurate as to all remaining matters.

8          I'll hear first from you, Mr. Willett, then from

9    Mr. Douglas, and then from Mr. Cronk on the sentence to be

10   imposed.

11         MR. WILLETT:  Thank you, Your Honor.  So, Your Honor,

12   if I have followed the Court's calculations right -- and I want

13   to be sure I do that before I step up to the plate, so to

14   speak -- the Court has determined that the total offense level

15   is 36?

16         THE COURT:  Yes.

17         MR. WILLETT:  The criminal history category is IV?

18         THE COURT:  Yes.

19         MR. WILLETT:  With acceptance of responsibility,

20   Mr. Douglas is still looking at 188 to 235 months.

21         THE COURT:  No.  No.  If he's a 36, IV, that's 262 to

22   327, I believe.

23         PROBATION OFFICER WULFF:  Yeah, I just checked.

24         MR. WILLETT:  Excuse me.  I'm sorry.  So hang on.  You

25   said 36 and IV.  262 to 327.

1          THE COURT:  Yes, but I also said that I'm not going to

2    sentence him under that guideline.

3          MR. WILLETT:  And that was my clue, Your Honor, so

4    I'll be brief.  May I --

5          THE COURT:  Well, you don't have to be brief.  I

6    just -- I agree that he qualifies for the enhancement.  I

7    disagree that it's worth six more years in prison.

8          MR. WILLETT:  Thank you, Your Honor.  Your Honor, I'm

9    going to turn back to my motion for downward variance, which was

10   filed at document 79, and as the Court is aware, the mandatory

11   minimum sentence of 10 years is certainly in effect.  Regardless

12   of where the Court decides the appropriate guideline range is,

13   the Court cannot go below 120 months.

14         There were three factors that stood out in my review

15   of the presentence report.  My client's physical condition --

16   and I was not Mr. Douglas's first attorney, so I was not aware

17   until recently the efforts made by the federal defender's office

18   at his detention hearing regarding his release because of his

19   heart condition, and I pointed that out to the Court at document

20   16-1, Defendant's Exhibit A, a letter from a physician regarding

21   his heart condition and how he did not believe detention would

22   best be served.  So the physical condition stood out to me

23   immediately, and then, of course, we've got his substance abuse,

24   and we have his difficult childhood.

25         Now, I won't take the Court through all those facts.

1   I know the Court has reviewed the presentence report.  All of

2   those factors -- those sort of traditional variance issues, if

3   you will, receive report from the Eighth Circuit.  *U.S. versus*

4   *Mays* is a very recent decision, a 2020 decision by the Eighth

5   Circuit where in response to a difficult childhood, the Court

6   varied downward 10 months, and I certainly think that

7   Mr. Douglas's childhood qualifies as difficult.  In regards to

8   his heart condition, I was able to find an older case, *U.S.*

9   *versus Gonzalez*, a 2014 Eighth Circuit decision where again the

10  Court varied down 10 months.

11          And then, finally, a very recent 2020 decision

12  regarding controlled substances -- so I've always been citing

13  the Court to *U.S. versus Frausto-Carlos* for years, but now *U.S.*

14  *versus Castellanos-Muratella* where the Court varied downward 5

15  years, and this was a meth case, and I think the quotation by

16  the Court is worth reflecting upon:  "Rather, it used

17  Castellanos's addiction to illustrate the seriousness of

18  methamphetamine-dealing.  The district court specifically noted

19  that Castellanos's addiction is reasonable to consider -- the

20  Court's own words -- when trying to reach a sentence that is

21  sufficient but not greater than necessary.  It thereafter

22  ordered a sentence five years shorter than the presumptively

23  reasonable Guidelines range."

24          So obviously all of these issues have found support,

25  from 10 months to 5 years.  I'm not going to try to speculate,

1  since the Court has already opined that a leadership role is not

2  worth a 6-year swing, where the Court's going to land, but I

3  believe it's appropriate in the Court reflecting upon where it

4  should land that a 6-year swing is too much.  The Court could

5  still look at these factors in addition to the extent of the

6  Court's downward variance knowing, of course, that the Court

7  cannot go below 120 months.

8           I would specifically request -- and I know during the

9  pandemic Article III judges are a little bit shy about

10  recommending facilities, but I have had clients older than

11  Mr. Douglas with significant heart conditions sent to the

12  federal medical facility at Rochester, Minnesota, and every one

13  of them walked out okay, and so I'm a big fan of the medical

14  facility at Rochester, and, of course, it's relatively close to

15  Iowa.  Obviously Mr. Douglas has a support base in southeastern

16  Iowa, and that's not too awful of a drive, but I would ask the

17  Court to consider Rochester, Minnesota.

18           THE COURT:  So everybody wants it right now.  That's

19  one of the problems.  And what would be your backup position, if

20  you have one?

21           MR. WILLETT:  I'm going to ask.

22           Mr. Douglas has been doing some reading on his own and

23  would like the Court to consider Oxford, Wisconsin, because he

24  understands the programs there are beneficial.

25           THE COURT:  Yep.

1          MR. WILLETT:  Thank you.

2          THE COURT:  Mr. Douglas, is there something you'd like

3   to say before sentence is imposed?

4          THE DEFENDANT:  Yeah, please.

5          THE COURT:  Just get close to that microphone.  Get a

6   little closer.  You can pull your mask down to allocute.

7          THE DEFENDANT:  Thank you.  First and foremost, I'd

8   like to thank everybody who came out to support me.  You've been

9   here with me the whole ride, day for day.  I mean, judgment day

10  is here.  I can't do nothing but take any sentence and accept

11  responsibility for my actions that I made.  I just ask when

12  considering my case that you can have a little mercy, if you

13  will, or you -- I don't know.  It's just hard.  This is my first

14  time ever going to prison, ever doing anything, so, you know,

15  what do you say in this situation?  You know what I mean?  I

16  mean, I know I'm not completely innocent in none of this, you

17  know, so there's consequences to my actions so --

18          THE COURT:  In 2010, you got two felony drug

19  convictions.  You were sentenced to 10 years and 5 years.  They

20  were suspended.  Everybody would have hoped that that would have

21  been kind of a wake-up call for you.  Why wasn't it?

22          THE DEFENDANT:  Just the way -- things that transpired

23  in my life at that time.  I was going through a lot of stuff.

24  Me and my wife had just separated.  You know, she was keeping

25  the kids from me.  I got laid off from my job.  Unemployment ran

1   out.  You know what I mean?  I couldn't get hired back no matter

2   how hard I tried, and just one thing led to another.  I started

3   messing with the drugs, got into the addiction of it.  One thing

4   led to another.  I'm here.  You know what I mean?  I'm not proud

5   of it at all, but, I mean, it's too late to -- I can't take it

6   back now.  You know what I mean?  So . . .

7           THE COURT:  All right.  Thank you.

8           Mr. Cronk?

9           MR. CRONK:  Thank you, Your Honor.  In a sense, I

10  think you read my mind a little bit.  I did want to refer to

11  paragraph 45 and 46.  I wanted the Court to look closely at

12  paragraph 59, also paragraph 58 and paragraph 62.

13          This defendant was dealing with Jeff Goins and getting

14  pounds of methamphetamine.  In January of 2020, as referenced in

15  the report and in the criminal history section, the January 4th

16  arrest, as well as in the offense conduct section, the defendant

17  was caught with a quarter kilo of methamphetamine in January of

18  2020.  He went out and bought another pound five weeks later

19  from Jeff Goins, and he apparently distributed that.  He got

20  arrested in March of 2020 with drug paraphernalia and what

21  looked like a couple of ounces of methamphetamine.  Bailed out

22  of jail.  And if you look at paragraph 62, he was arrested in

23  Des Moines County for unlawful possession of, it looks like, 20

24  blue pills of amphetamine.  That didn't stop him.  He kept right

25  on getting meth and kept right on selling meth.

1          When Jeff Goins was arrested in February and went to

2   prison -- or went to jail and got charged in federal court,

3   you'd think that might be a wake-up call for Mr. Douglas.  The

4   people he's dealing with are going to go to federal prison.  Of

5   course, Mr. Goins had already been to federal prison, gotten

6   out, and went right back out to selling drugs just like

7   Mr. Douglas.  Mr. Douglas should have had a number of wake-up

8   calls here, and what he has done is continued to distribute

9   methamphetamine, and he hasn't done it alone.  He hasn't done it

10  by himself.  He's had people working for him.

11         He doesn't want to get caught driving, and, you know,

12  that may not sound so bad, but when you have a knowledgeable

13  person driving you around, serving your customers and collecting

14  your debts, you're a more serious criminal than someone who does

15  not.  That other person is taking risks.  They're risking going

16  to prison for what you have them do.  They're getting someone

17  else involved in the activity, multiplying the number of people

18  you can have contact with, improving your business.  Mr. Douglas

19  has -- he drove to Galesburg -- he had someone drive him to

20  Galesburg, Illinois, in May of 2020 and was caught with two

21  ounces of methamphetamine.  I'm not sure exactly why this hasn't

22  interrupted him, but none of it has.  He has not been

23  interrupted, and the huge value of coming here today and having

24  this consequence is to interrupt him, and it's to interrupt him

25  for a significant period of time to protect the public.  He

1  hasn't gotten the message.  He needs to have a significant

2  period of time in prison to consider the life that he has built,

3  the people whose lives he's damaged, and the seriousness of this

4  behavior.  Thank you, Your Honor.

5        THE COURT:  In fashioning an appropriate sentence, I

6  have considered each of the factors found in Title 18, United

7  States Code section 3553(a), which means I have considered the

8  nature and circumstances of this offense as well as the history

9  and characteristics of Mr. Douglas.  I have considered the

10  seriousness of this offense.  It's obviously serious for the

11  substantial quantity of methamphetamine involved, for the period

12  of time that -- that this transpired over, for the persistence

13  of it, the successfulness of this criminal activity.

14        I've considered the question of just punishment.  This

15  is his fifth drug conviction and third felony drug conviction.

16  He was treated with substantial lenience in state court when --

17  when he suffered two felony drug convictions and was revoked

18  twice on supervision for those offenses.  Mr. Cronk is right.

19  Nothing is stopping Mr. Douglas, and that's -- that's a very

20  serious consideration in sentencing here.

21        I've considered the need for adequate deterrence to

22  criminal conduct.  The need to protect the public from further

23  crimes from this defendant is real.  I've looked to the

24  sentencing guidelines as an important, though not in any way

25  controlling, factor to be considered, as I've already expressed.

1   I've weighed heavily the need to avoid unwarranted sentencing

2   disparity among defendants with similar records who have been

3   found guilty of similar conduct.  I have considered his health.

4   I've considered his childhood and his age.  I've considered his

5   addiction, and I always want to know the extent to which

6   addiction drives criminal activity and then the extent which the

7   criminal activity exceeds addiction-driven behavior as well, and

8   I have considered that.

9       After considering all of those factors as well as all

10  of the arguments of counsel and the allocution of Mr. Douglas, I

11  conclude that the following sentence is sufficient, but not

12  greater than necessary, to address the essential sentencing

13  considerations.  It is the judgment of the Court that Terry Lee

14  Douglas, III, is sentenced to the custody of the Bureau of

15  Prisons for 200 months on Count 1 of the indictment.

16       Upon release from prison, you'll be placed on

17  supervised release for 5 years.  Within 72 hours of release from

18  the Bureau of Prisons, you shall report in person to the

19  probation office in the district where you are released.  While

20  on supervised release, you shall not commit another federal,

21  state, or local crime; you shall not possess a firearm or

22  destructive device; you shall not illegally possess a controlled

23  substance.  You shall comply with all the standard conditions of

24  supervision as adopted by the sentencing commission plus the

25  special conditions in your presentence report in paragraphs 141

1   to 146.

2           Did you object to any of those, Mr. Willett?

3           MR. WILLETT:  The special conditions?  No, Your Honor.

4           THE COURT:  I find that you do not have the ability to

5   pay a fine, and that's waived.  You're ordered to pay the $100

6   special assessment.  It's due and payable immediately, without

7   interest, to the clerk of court.

8           I recommend that he be evaluated for a medical

9   placement; if not granted, that he be placed at Oxford,

10   Wisconsin, to be close to home and for vocational opportunities.

11           I recommend that he be made eligible for the 500-hour

12   Bureau of Prisons Residential Drug Abuse Program.

13           Do you have a motion to make with respect to Counts 2

14   through 6?

15           MR. CRONK:  We move to dismiss those counts, Your

16   Honor.

17           THE COURT:  They're dismissed.

18           Is there forfeiture here?

19           MR. CRONK:  There is no firearm or anything like that

20   I don't believe.

21           THE COURT:  You have the right to take an immediate

22   appeal from this judgment.  Any appeal has to be filed within 14

23   days from today.

24           Mr. Willett, do you have anything else?

25           MR. WILLETT:  No, Your Honor.

1          THE COURT:  Mr. Cronk, do you?

2          MR. CRONK:  No, Your Honor.

3          THE COURT:  We're in recess.

4          (Proceedings concluded at 9:46 a.m.)

5

6                    C E R T I F I C A T E

7          I, Tonya R. Gerke, a Certified Shorthand Reporter of
   the State of Iowa and Federal Official Realtime Court Reporter
8  in and for the United States District Court for the Southern
   District of Iowa, do hereby certify, pursuant to Title 28 U.S.C.
9  Section 753, that the foregoing is a true and correct transcript
   of the stenographically reported proceedings held in the
10 above-entitled matter and that the transcript page format is in
   conformance with the regulations of the Judicial Conference of
11 the United States.
           Dated at Des Moines, Iowa, May 5, 2021.
12
                         /s/ Tonya R. Gerke
13                       Tonya R. Gerke  CSR, RDR, CRR
                         Federal Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25

```
1                          INDEX
   WITNESSES
2
        JESSE BELL, GOVERNMENT WITNESS
                                                    6
4   DIRECT EXAMINATION BY MR. CRONK               6
5   CROSS-EXAMINATION BY MR. WILLETT             19
6   REDIRECT EXAMINATION BY MR. CRONK            26
7   RECROSS-EXAMINATION BY MR. WILLETT           29
8   FURTHER REDIRECT EXAMINATION BY MR. CRONK    31
9        RYAN WOOD, GOVERNMENT WITNESS           32
10  DIRECT EXAMINATION BY MR. CRONK              32
11  CROSS-EXAMINATION BY MR. WILLETT             34
12
13  EXHIBITS
14   Government Exhibit 1                         12
15   Government Exhibit 2                         13
16   Government Exhibit 3                         15
17   Government Exhibit 4                         15
18   Government Exhibit 5                         17
19   Government Exhibit 6                         18
20
21
22
23
24
25
```